1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9
10

| | |
|---|---|
| MARK THOMPSON,<br><br>      Petitioner,<br><br>   v.<br><br>RED FOULK,<br><br>      Respondent. | Case No.  1:14-cv-00140- SAB-HC<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DIRECTING CLERK OF COURT TO ENTER JUDGMENT IN FAVOR OF RESPONDENT, AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITUY<br><br>(ECF No. 1) |

11
12
13
14
15
16

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent is the Warden of High Desert State Prison.  He is represented in this action by Catherine Tennant Nieto, Esq., of the California Attorney General's Office.  Both parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation (CDCR) pursuant to an August 24, 2011, judgment of the Superior Court of California, County of Fresno, following his conviction by jury trial on two (2) counts of robbery, with a firearm enhancement on one count and a gang enhancement on both counts.  (Pet., ECF

No. 1).  He was sentenced to serve a term of 27 years 4 months in prison.  (Answer, Ex. A at 15, ECF No. 11).

Petitioner timely filed a notice of appeal.  On August 28, 2013, the California Court of Appeal, Fifth Appellate District, affirmed the judgment.  People v. Easter et al., No. 5063263, 2013 WL 4683011 (Cal. App. 2013); Answer, Ex. A).  Petitioner then filed a petition for review in the California Supreme Court.  (LD 17).  On December 11, 2013, the petition was summarily denied.  (Pet., Ex. D).

On February 3, 2014, Petitioner filed the instant federal petition for writ of habeas corpus in this Court.   The Petition presents the following two grounds for relief: (1) there was insufficient evidence to find the gang enhancement and gang count; and (2) trail court erred by not bifurcating the gang enhancements and gang count from the robbery counts.  (Pet. at i). Respondent filed an answer to the petition on June 16, 2014.  Petitioner did not file a traverse.

## II.

## STATEMENT OF FACTS[1]

### A.  Prosecution Evidence

> ***Robbery of Josh Franco (count II; defendants Williams, Thompson, Easter)***
> Josh Franco, a high school teacher, placed a cell phone for sale on Craigslist, an Internet sales site. Franco listed his personal cell phone as the contact number.
>
> At 11:00 a.m. on September 7, 2009, Franco received a call from a 408 area code. A man said he wanted to meet and look at the phone. The caller, later identified as defendant Williams, said he needed to delay the meeting because he was in church. At 1:30 p.m., Williams again called Franco and said to meet him in a church parking lot at Ashlan and Hughes.
>
> At 3:00 p.m., Franco drove into the church's parking lot. Williams called and said he was running late. Franco waited for 15 minutes and was about to leave when he saw a black SUV driving on the adjacent street. The SUV pulled into an apartment complex. Franco believed there were more than three people in the vehicle and thought the occupants were looking at him.

---

[1] The Fifth District Court of Appeal's summary of the facts in its August 28, 2013, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the state appellate court. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

About five minutes later, three African–American males walked across the street and approached Franco's truck. The three men tried to open the front passenger door, but it was locked. Franco got out of his vehicle and spoke to the men. One of the men asked to see the cell phone. Franco believed this man was the person who called him (Williams). He looked at the phone and said it was in good shape.

Within seconds, another man in the group pulled a gun and said: " 'Give us everything you got.' " Franco testified the gunman had shoulder-length dreadlocks and a goatee. He was wearing a white T-shirt, black shorts, and a black baseball cap. Williams and the third man emptied Franco's pockets in about 10 seconds. The three men then ran across the street, toward the apartment complex. Franco testified none of the men said anything about gangs during the robbery.

As we will explain, *post,* Williams and Thompson admitted their participation in this robbery. Easter denied committing the crime. Franco identified Easter as the suspect with the dreadlocks, and said he was the gunman.

Based on this offense, defendants Williams, Thompson, and Easter were charged and convicted of count II, second degree robbery of Franco. The jury found true the gang enhancement, and that Easter personally used a firearm.

### Robbery of Nicholas Flechsing (count III; defendant Williams, only)

Nicholas Flechsing, a college student, listed his Xbox video game console for sale on Craigslist. In the late morning or early afternoon of September 9, 2009, Flechsing received a call from a phone with a 408 area code. The caller, later identified as Williams, said he wanted to buy the Xbox. Flechsing told Williams to meet him at Fig Garden Village, and Williams agreed.

Flechsing rode his bicycle to Fig Garden Village and waited for 20 minutes, but the prospective buyer did not appear. Flechsing called him back, and the man said he was "taking a little bit longer than usual." Williams asked if they could meet somewhere else. They agreed to meet at the corner of Ashlan and Palm. Flechsing rode his bicycle there, but the man never showed up.

Flechsing made another call, and Williams said that he was on his way. Flechsing rode his bicycle toward the railroad tracks at Ashlan and Fruit, and waited for 5 to 10 minutes. Williams called Flechsing and said he could see him down the street, and directed Flechsing to meet him at the corner of Fruit and Swift.

Flechsing rode his bicycle to the new location. Williams was standing on the street. Williams walked up to his bicycle. Flechsing opened his backpack and showed the Xbox to Williams, and asked for $400.

Flechsing testified that Williams started to grab his backpack.

Suddenly, another man appeared and pulled a handgun from his waistband. The gunman was African–American, and his hair was shoulder-length and in dreadlocks.

Flechsing testified the gunman cocked the weapon, loaded the chamber, and pointed the gun at his chest. The gunman ordered Flechsing to give him his property. Flechsing gave Williams his backpack with the Xbox; his cell phone; and his wallet, which contained his identification and $200.

Williams and the gunman looked Flechsing "up and down," and then ran down the street. Flechsing started to ride away on his bicycle. The gunman turned around and pointed his handgun at Flechsing. Flechsing raised his hands and said, " 'I'm not going to do anything.' " Williams and the gunman ran away. Flechsing testified that neither suspect wore red or blue, and they did not say anything about a gang during the robbery.

As we will explain, *post,* Williams confessed to his involvement in this robbery. Williams was separately charged and convicted of count III, second degree robbery of Flechsing. Prior to trial, Flechsing never identified anyone as the gunman or second robbery suspect. Thompson and Easter were not charged with or convicted of committing this robbery.

### Robbery of Garrett Gaynor (count I; defendants Williams, Thompson, Easter)
Garrett Gaynor listed his Blackberry Gold phone for sale on Craigslist. Gaynor listed his own cell phone as the contact number.

On September 9, 2009, the same day that Flechsing was robbed, Gaynor received a call from a 408 area code from a man who wanted to buy the Blackberry. Gaynor agreed to meet the man at a particular location. The prospective buyer, later identified as Williams, repeatedly called back and changed the location. Gaynor finally told Williams that he would meet him after work. They agreed to meet at the Walgreens parking lot at Ashlan and Marks.

At 9:00 p.m., Gaynor arrived at Walgreens, parked his car, and waited. Williams called him again and asked if he was there. Gaynor said yes. Gaynor testified that three young African–American men appeared at his car. Williams asked Gaynor if he was selling a phone. Gaynor said yes. Williams was holding a white T–Mobile cell phone.

Gaynor testified the second man was wearing a red baseball cap and blue jeans. The third man had shoulder-length black hair, which was in dreadlocks with red tips.

Gaynor got out of his vehicle and met the three men at the back of his car. He showed them the Blackberry and handed it to Williams. Williams examined the Blackberry and asked if it could hold a charge. Gaynor said he had the power plug and suggested they walk to Walgreens to charge the phone. As the group started to walk toward the store, Williams ran away with Gaynor's phone.

Gaynor testified that Williams ran toward an apartment complex. The other two men asked Gaynor where Williams went. Gaynor replied: "... I don't know, let's go get him. And as that started happening, they had taken off, as well, across the street," in the same direction as Williams.

Gaynor testified: "I proceeded to follow them, or chase them." The two men ran toward an apartment complex's side gate. They went inside, and the gate closed behind them.

Gaynor ran to the gate, but it was locked. Gaynor testified that when he got to the gate, the three men "were just all pretty much standing there and the one individual came back out and put a gun to my head...."

Gaynor testified the gunman was the man who was wearing the red baseball hat. Gaynor testified Williams and the man with red-tipped black dreadlocks were clearly visible to him. They stayed inside the apartment gate, and they stood there and watched the gunman.

Gaynor testified the gunman put the gun to his forehead and order him to turn over everything he had, and threatened to kill him. The gunman reached into Gaynor's pockets and took Gaynor's wallet and personal cell phone. Williams and the man in the dreadlocks stayed in their same location and watched. The gunman placed the gun under Gaynor's chin and threatened to kill Gaynor if he turned around.

After taking the property, the gunman ran back inside the apartment gate, joined Williams and the other man, and all three men ran away. Gaynor testified the three suspects never said anything about gangs during the robbery.

As we will explain, *post,* Gaynor identified Williams and Thompson during an infield show-up on the night of the robbery and said Thompson was the gunman. Gaynor later identified Easter from a single photograph as the third suspect with the dreadlocks. Williams and Thompson admitted their involvement in this robbery. Easter denied committing the crime.

Based on this offense, Williams, Thompson and Easter were charged and convicted of count I, second degree robbery of Gaynor. The jury found true the gang enhancement, and that Thompson personally used a firearm.

### *INVESTIGATION OF GAYNOR ROBBERY*
### *Discovery of handgun and stolen property*
Around 10:10 p.m. on September 9, 2009, several officers responded to the Walgreens parking lot and interviewed Gaynor about the robbery. Based on Gaynor's information, the officers spoke to the manager of the apartment complex on Ashlan and Marks. The manager's information led them to a particular apartment. The tenant gave the officers permission to enter.

Defendants Thompson and Williams were in the apartment. The officers found Flechsing's stolen Xbox and videogames in the living room, and his ATM card in another room.

The officers found a large stereo speaker box in the bedroom. It contained a nine-millimeter semiautomatic handgun and a magazine. The magazine was loaded with live nine-millimeter rounds and appeared to fit the weapon.

The same stereo speaker box also contained three cell phones: Gaynor's Blackberry that he showed to Williams and he ran away with; Gaynor's personal cell phone that was taken by the gunman; and a white T–Mobile cell phone.

***Gaynor's identification of Thompson and Williams***
As the investigation continued on the night of September 9, 2009, the officers drove Gaynor past two or three men standing on the street, near the apartment complex, and asked Gaynor if any of these men were the robbery suspects. Gaynor said no.

Later that night, an officer escorted Gaynor to an infield show-up of three other men: Williams, Thompson, and a third man. Easter was not present.

Gaynor immediately identified Thompson and Williams as two of the robbery suspects, and said Thompson was the gunman. Gaynor said he was 100 percent certain of the identifications. Gaynor said the third man in the show-up was not involved in the robbery.[8]
The record implies that Thompson and Williams were arrested that night.

***Williams's postarrest interview***
In the early morning hours of September 10, 2009, Detective Mares interviewed Williams at the police substation. Mares advised Williams of the warnings pursuant to Miranda v. Arizona (1966) 384 U.S. 436, and Williams waived his rights. Williams was 16 years old.

Detective Mares asked Williams about the while T–Mobile cell phone found in the apartment, next to Gaynor's stolen phones. Williams said it was his cell phone and had a 408 area code. Detective Mares determined that 14 calls were placed from Williams's cell phone to Franco's cell phone. There were 10 calls placed from Williams's cell phone to Gaynor's cell phone.

During the interview, Williams admitted that he had been involved in the robberies in the church parking lot (Franco), the Walgreens parking lot (Gaynor), and the one involving the Xbox (Flechsing). Williams said that at the Walgreens robbery of Gaynor, he ran away with the victim's cell phone. He also said a gun was used.

Detective Mares testified that Williams said a gun was also used during the robbery in the church parking lot, and two cell phones were taken from the victim (Franco). Williams said the gunman's name was "Alex" or "A–1." Detective Mares testified that

6

Williams did not identify Easter as the gunman or a suspect in the robbery.

As for the Xbox robbery of Flechsing, Williams said that he took the victim's backpack and the Xbox, and ran away. Williams said that a gun was also used during this robbery. He did not identify the gunman.

**The cell phone picture of Easter**
Gaynor told the officers that the third robbery suspect was slightly taller, and his hair was in dreadlocks with red tips. Later on September 10, 2009, Detective Mares reviewed the photographs on Williams's T–Mobile cell phone to see if anyone matched Gaynor's description.

Mares found a photograph on Williams's cell phone, identified as exhibit No. 7, which showed two African–American males: Williams, and a man with his hair in dreadlocks with red tips. The cell phone also contained a photograph of Williams, Thompson, and the man with the red-tipped dreadlocks. Officer Robert Yeager reviewed the images and identified the man with the dreadlocks as Brian Easter, based on Yeager's prior contacts with him.

**Gaynor's identification of Easter**
On September 10, 2009, Detective Mares showed Gaynor the photograph of Williams and Easter, identified as exhibit No. 7, as it was displayed on the white T–Mobile cell phone. Mares did not reveal their identities, and he read the following admonition to Gaynor:

"... I was in possession of a phone[,] that it was not my phone. I told him that there was a photograph on this phone that I wanted him to look at. I told him that I did not know who was in the photograph, I did not know the name of the individual. And I told him that, 'It may or may not be involved in your case.' "

Detective Mares testified that Gaynor looked at the cell phone photograph and said both men were involved in the robbery. Gaynor testified that he had already identified one man on the night of the robbery, as the suspect who ran off with the Blackberry (Williams). Gaynor identified the other man in the photograph, with the red-tipped dreadlocks, as the third robbery suspect. Gaynor said the man with the dreadlocks did not have the gun.

Gaynor also said he recognized the white T–Mobile phone which contained the photograph because Williams was holding it during the robbery.

**Franco's identification of Easter**
Also on September 10, 2009, Detective Mares showed Joshua Franco the photograph of Williams and Easter, as depicted on the white T–Mobile cell phone. Mares did not identify the men, and read the same admonition to Franco as he read to Gaynor.

Franco identified Easter as the robbery suspect with the dreadlocks, and said this man held the gun during the robbery in the church parking lot. Franco also recognized the white T–Mobile cell phone, and said the smaller suspect (Williams) used it during the robbery.

Easter was arrested on November 14, 2009.

***Photographic lineups***
Detective Mares showed Franco several "six-pack" photographic lineups, which included pictures of Williams and Thompson. Franco identified Thompson as the man who went through his pockets during the robbery. Franco did not identify Williams from the lineups.

Detective Mares never showed Franco or Gaynor any six-pack photographic lineups with Easter's picture. Mares admitted that was "not standard operating procedure." Mares confirmed he only showed a single photograph to Gaynor and Franco, Williams and Easter were in that picture, and he showed the picture to the victims after Williams had been identified.

Detective Mares testified that he looked for the suspect who Williams identified as "Alex" or "A–1," but he never found such a person.

***THE VICTIMS' TRIAL TESTIMONY AND IDENTIFICATIONS***

***Garrett Gaynor***
Garrett Gaynor testified at trial that he identified Williams and Thompson during an infield show-up on the night of the robbery. Gaynor testified the police showed him several photographs to identify the third suspect, but none of the photographs showed that person. Gaynor testified he was finally shown a photograph of a single person, and identified that person—Easter—as the third suspect with the red-tipped dreadlocks.

Gaynor testified that Detective Mares showed him a photograph of two men from a cell phone, which showed Williams and the suspect with the dreadlocks. Gaynor testified he also looked at a photograph with three individuals. When he looked at this picture, he had already identified two of the men on the night of the robbery, and he identified the third man as the suspect with the dreadlocks. Gaynor did not think that he identified Easter from the photographs which showed the suspects standing together.

Gaynor testified that exhibit No. 3 showed the three men who robbed him: the first man who spoke to him and ran off with the Blackberry (Williams), the gunman who wore the hat (Thompson), and the man with the red-tipped dreadlocks (Easter).

Also at trial, Gaynor identified Thompson as the gunman in the red hat. Gaynor identified Easter as the suspect who wore his hair in dreadlocks with red tips, even though Easter's hair was now in a short buzz-cut. Gaynor identified Williams as the person who

called him about the Blackberry, met him at his car, and ran away with the phone.

Gaynor reviewed the photograph of the nine-millimeter semiautomatic handgun found in the apartment on the night of the robbery. Gaynor identified the firearm as the weapon the gunman held at his head, which had a silver barrel and black handle. Gaynor again identified the white T–Mobile cell phone as the device which Williams was holding when they met in the parking lot.

### Josh Franco

Josh Franco testified that a few days after the robbery, the police showed him a series of photographic lineups. Franco positively identified one man as being involved in the robbery, but he was not sure if that man was the gunman.

Franco testified he also looked at a photograph of two men. He was read an admonition before he looked at this photograph, and told that it might not be the suspect. He identified one man as the gunman, and he was positive about the identification when he made it.

At trial, Franco identified defendant Thompson as one of the robbery suspects, and Thompson was not the gunman. He believed Thompson was the man he identified in the photographic lineup. Franco testified that he initially believed the man he identified in the photographic lineup (Thompson), and the man in the single photograph (Easter), were the same person, but later realized they were different people.

Franco reviewed the photograph of the handgun found in the apartment (Exhibit No. 26), and testified it was very similar to the firearm used by the gunman during the robbery. Franco recognized the silver barrel and the distinctive black handle.

### Nicholas Flechsing

Nicholas Flechsing testified that about three days after the robbery, Detective Torres showed him several photographic lineups. Flechsing identified Williams from one of the lineups (Exhibit No. 43), and said he was "absolutely positive" that Williams was the man who called him and met him on the street. Williams was not the gunman. At trial, Flechsing identified Williams as the man who met him on the street. Flechsing did not identify anyone from the photographic lineups as the gunman.

Flechsing testified the chrome-plated handgun with the black grip, which was found in the apartment, was similar to the weapon used by the gunman during the robbery.

### THE PROSECUTION'S GANG EXPERT

As to counts I and II, the robberies of Gaynor and Franco, gang enhancements were alleged as to all three defendants (§ 186.22, subd. (b)(1)). In count IV, defendants were charged with the substantive offense of active participation in a criminal street gang

1   (§ 186.22, subd. (a)).

2   Fresno Police Officer Ron Flowers testified as the prosecution's
    gang expert. He had been a gang investigator with the Multi–
3   Agency Gang Enforcement Consortium (MAGEC) since 2003. He
    worked specifically with African–American gangs in Fresno. He
4   had investigated close to 600 gang-related crimes. Flowers
    identified gangs, validated an individual's gang membership, and
5   tracked crimes committed by gang members. Flowers had qualified
    as a prosecution gang expert approximately 40 times.

6
    **The "Playboyz" Gang**
7   Officer Flowers testified that the "Playboyz" is an African–
    American criminal street gang. Flowers first became aware of the
8   Playboyz in 2004 or 2005, when a shooting occurred which
    involved four victims. Flowers verified the four victims were
9   members of the Playboyz gang. Flowers validated the existence of
    the Playboyz at that time.

10
    "My partner and I were able to verify that there was a group that
11  called themselves the Playboyz here in Fresno [C]ounty, and
    eventually we were able to identify members of that particular
12  group. And that was confirmed through certain crimes that
    occurred in the city of Fresno."

13
    Officer Flowers testified the Playboyz's primary colors were blue
14  and red. Flowers acknowledged that blue was commonly claimed
    by the Crips, while red was claimed by the Bloods. However,
15  Flowers explained that it was not unusual for a Fresno gang to
    claim both red and blue. "It is not like Bloods and Crips. We have
16  gangs that have Bloods and Crips within themselves[,]" and "[i]t is
    not unusual here in Fresno to find those two groups in one gang...."
17  Flowers testified that African–American gangs in Fresno and Los
    Angeles had different philosophies about colors. For the gangs in
18  Fresno, colors were "not critical" and did not have "much of an
    adverse effect as it does in Los Angeles."

19
    Officer Flowers believed there were approximately 34 to 35
20  members of the Playboyz in Fresno. Flowers personally knew three
    or more members of the gang. Flowers had conversations with
21  members of the Playboyz about their lifestyles, loyalties, criminal
    gang activities, membership, signs, colors, tattoos, and graffiti.
22  Flowers testified he reviewed about 60 police reports about the
    activities of the Playboyz.

23
    The Playboyz gang used the "Playboy" emblem from Hugh
24  Hefner's Playboy magazine as one of their symbols. The gang
    members also configured their hands to appear like Playboy bunny
25  ears. Flowers had seen rivals mocking the same hand sign.

26  Flowers testified that the area under the Playboyz's "dominion of
    control" was in northwest Fresno, between Herndon and
27  McKinley, and Polk and Marks. The Playboyz did not claim that
    area as its specific turf, but "there have been a lot of events specific
28  to this group within that area."

10

Flowers had also seen the word "Playboyz" used in gang writings on clothing, documents, glass, and MySpace pages. However, he had never seen any Playboyz-related graffiti in a particular area or anywhere else in Fresno. Flowers explained that some gangs are not "turf-oriented" and don't have issues over particular territories.

**Primary activities**

Officer Flowers testified that he had reviewed approximately 70 to 80 police reports involving members of the Playboyz gang. Flowers testified the primary activity of the Playboyz gang was robbery, in violation of section 211. Flowers's opinion was based on his review of approximately 12 police reports involving incidents where members of the Playboyz committed robberies, from 2006 to 2009. Flowers testified the gang had "the pattern, again the consistency of violating Penal Code [section] 211."

Flowers testified he had also investigated homicides, shootings, and firearm cases which involved members of that gang.

**Predicate offenses**

Flowers testified about several predicate offenses committed by validated members of the Playboyz gang, based on his review of certified copies of their convictions. These predicate offenses were not committed by any of the defendants. In 2005, Christopher Williams was convicted of murder (based on a vehicular homicide), transportation of narcotics for sale, and possession of cocaine base for sale. In 2006, Duane Perry was charged with second degree robbery and convicted of attempted grand theft. In 2008, Anthony Skinner was convicted of illegal possession of a weapon. In 2009, Rafael Houston pleaded guilty to illegal possession of a weapon. In 2009, Robert Tyler was convicted of illegal possession of a weapon; and in 2008, he was convicted of vehicle theft.

On cross-examination, Flowers conceded that while these predicate offenses were committed by members of the Playboyz gang, there were no gang enhancements alleged or found true in those cases. Flowers also conceded that none of the predicate offenses involved robbery charges. Flowers further testified that he did not believe anyone had been convicted of the substantive offense of active participation in a criminal street gang as a member of the Playboyz.

**Defendants' memberships in the Playboyz**

Officer Flowers testified to his opinion that Thompson, Williams, and Easter were active members of the Playboyz gang. Thompson admitted being a member of the Playboyz on six occasions in jail classification settings in January and April 2008, and January, February, and September 2009. On January 5, 2009, Thompson admitted his gang affiliation to Fresno homicide detectives.

Thompson had been documented as associating with Playboyz gang members in June 2003, August 2003, November 2004, and May 2007. Thompson was arrested with other members of the

Playboyz on July 4, 2004, November 6, 2004, and January 23, 2009.

Officer Flowers classified Thompson as an active participant in the gang based on the crimes he had committed, and his regular association with other active members of the gang. Flowers identified Thompson in a photograph which showed him making the Playboyz hand sign, placing his fingers like rabbit ears. Thompson had a tattoo of the Playboy bunny on his left arm, with the word "Playboyz" written underneath it.

Officer Flowers testified that Easter was arrested on February 14, 2006, with Tyrone Williams, a member of the Playboyz. On May 24, 2008, Easter was documented as associating during a shooting incident with Tyrone Williams, Anthony Silva and Maharie Kidan, who were also members of the Playboyz. On July 10, 2008, Easter was arrested with Robert Lee and Maharie Kidan. On January 3, 2009, Easter was with Tyrone Williams when he was contacted about being present during a homicide. On April 8, 2009, Maharie Kidan was arrested, and he claimed Easter provided him with a weapon. On May 28, 2009, Easter was contacted during a traffic stop with Anthony Skinner, a member of the Playboyz.

Flowers testified that Easter's nickname was "Kook." Flowers classified Easter as an active participant in the Playboyz based on his behavior and nature and frequency of his contacts.

Officer Flowers testified that on January 3, 2009, Williams was identified as a member of the Playboyz by homicide detective Todd Frazier. On April 27, and July 19, 2009, Williams was documented as associating with, respectively, Tyrone Williams and Jason Bryant, members of the gang. On June 7, and September 10, 2009, Williams admitted to juvenile probation officers that he was a member of the Playboyz gang.

Flowers testified Williams was an active participant in the Playboyz gang because "his behavior is more than nominal, as we outlined the many contacts through law enforcement and the related offenses during those investigations."

***Williams's cell phone and the videos***
Williams's cell phone contained a contact list. Officer Flowers testified the names included "PB Kook," "PB Crane," "PB Gunne," and "PBJKIDDDDD." Flowers believed "PB" was an acronym for "Playboyz."

There were also two videos on the cell phone. Both videos were played for the jury in this case.

One video showed Easter, Thompson, Williams, and another man in the bathroom of the same apartment which was searched on the night of the robbery. Thompson was holding a semiautomatic handgun, which was similar to the weapon found in the apartment and identified by the victims. The "bathroom" video was recorded on September 4, 2009.

Officer Flowers testified that defendants' conduct on the "bathroom" video supported his opinion that they were members of the Playboyz, based on their dialogue, hand signs, displays of tattoos and the gun, and discussion of specific rivals. The defendants mentioned "The Mob, Klette Mob, also known as the Laidlaw Boys" as a rival gang. Terrance Bryant was the fourth man in the video, and he displayed a red tattoo of the letter "P" on his chest.

The second video showed several young men in a parking lot. It was recorded on September 5, 2009. Officer Flowers testified the "parking lot" video showed Thompson, Williams, and other young African–American males. They were announcing "Playboyz," and displaying Playboyz hand signs. Officer Flowers did not see Easter in that video.

Flowers testified the expressions and statements made by defendants in the videos clearly promoted the Playboyz gang. "Judging from the content and the dialogue and the expressions made, I would be under the impression that these individuals had done something and were warning others and claiming their gang membership openly."

### The charged offenses
Officer Flowers conceded that a gang member may commit a crime or a robbery for personal reasons and not for the benefit of the gang. Based on a series of similar hypothetical questions, Flowers testified to his opinion that the robberies were committed in association with a criminal street gang. All of the perpetrators were members of the same gang, they committed the crimes in concert, and they conspired together to commit the robberies.
While the participants did not say the gang's name during the robberies, the crimes benefitted the gang by building its reputation and each defendant's notoriety. The robbery proceeds also benefitted the gang financially by enabling the gang members to buy guns, and increased their individual prestige and the gang's prestige.

Officer Flowers further explained that gang members gain respect through committing acts of violence. These actions allow the gang members to instill fear in the community and among their rivals. "Other members see it, other members want to be a part of it. They want to repeat. They want to join. That's the dangerous element about group participation."

### DEFENSE EVIDENCE

Thompson and Easter testified at trial; Williams did not testify.

### Thompson's trial testimony
Thompson, who was 23 years old, admitted he had prior convictions for felony statutory rape and petty theft in 2007. He obtained the "Playboyz" tattoo on his arm when he was 14 years

old to show his cousin that he liked girls.

Thompson testified that he was depicted in the "bathroom" video, which was filmed in September 2009 at his grandmother's apartment. Easter, Williams, and Terrance Bryant were also in the video. Thompson admitted that he held a gun in the video. Thompson testified that he was in a "bad place" in his life at that time. He was "... doing Ecstasy, smoking all kinds of weed, you know, just being stupid." Thompson said he was in the parking lot video with his cousins. Williams filmed the video. Easter was not there.

Thompson admitted that he was present during the Gaynor and Franco robberies, and Williams was also there.

Thompson testified the robberies were not committed for the benefit of the Playboyz or any gang, but because he needed money for his rent and he did not have a job. Thompson testified he was not present during the Flechsing robbery.

Thompson testified he robbed Gaynor at gunpoint and used the nine-millimeter handgun which was found in his grandmother's apartment. Williams and an unknown third man were also present. He said that Williams made the telephone calls to set up the robbery.

Thompson testified that he was present when Franco was robbed. Thompson was not the gunman, but the same gun was used from the Gaynor robbery. Thompson went through Franco's pockets during the robbery. Williams and an unknown third man were present during the robbery.

Thompson initially testified that the unknown suspect who was present during the Gaynor robbery was not the same unknown man who was present during the Franco robbery. As to the Gaynor robbery suspect, Thompson testified he met this man in the apartment complex, and the robbery was this man's idea.

Thompson testified he feared for his life if he identified the third suspect in the Franco robbery. Thompson knew this man from the apartment complex, and this man always wore blue and said he was a Crip. Thompson admitted he committed the Franco robbery in association with a Crip.

During cross-examination, Thompson's description of the third suspect began to change, and he admitted that the same man was the third suspect for both the Franco and Gaynor robberies. Thompson testified this man was a member of the Crips, and he knew the man was a Crip when they committed both robberies.

Thompson testified that he knew about the Playboyz, but insisted it was not a street gang: "It's a family.... [M]ost of the people that are in it are all family, all cousins and brothers." "To us it is not a gang." Thompson and some of his cousins referred to themselves as Playboyz, but he meant that he was a "player" with the girls.

Thompson testified that the Playboyz partied and went to clubs when they were together.

On further cross-examination, Thompson admitted he was a member of the Playboyz and there were about 20 members, including many people in his family. Thompson knew Christopher Williams, Anthony Skinner, Christopher Williams, Jason Bryant, Tyrone Williams, and Rafael Houston, and also knew they were members of the Playboyz.

Thompson testified that members of the Playboyz did not get along with the "Northside" and "Murder Squad" gangs because they did not want to join those two gangs. Thompson repeatedly denied the Playboyz was a criminal street gang, that the members committed crimes, or that its primary purpose was to commit robberies. Thompson admitted that he claimed membership in the Playboy Crips during the jail classification interviews. He did so to avoid being jumped in jail. He said there was no such group as the Playboy Crips.

Thompson testified that Williams was a member of the Playboyz. Thompson knew Williams was a member when they committed the robberies. Thompson testified that Easter was not a member of the Playboyz, and he was not present during the Gaynor and Franco robberies.

On further questioning, Thompson testified he was not afraid to implicate Williams because he knew that Williams already talked to the police and said he was involved in the robberies. Thompson testified he knew that Easter had not implicated himself in the robberies. Thompson testified he was afraid to implicate Easter as the third suspect because Easter had not implicated himself. Thompson testified he was related to Easter, and Thompson had known Easter for his entire life. He did not want Easter to get into trouble, but denied that he would lie for Easter.

### Easter's trial testimony

Easter testified he had known Thompson since elementary school. He did not know Thompson was a member of the Playboyz until he heard Thompson's trial testimony. He had known Williams since high school, and did not know whether he was a member of the Playboyz. Easter testified the Playboyz were people who went to "dance parties, and like going out to the clubs and stuff...."

Easter admitted that he was in the bathroom video with Thompson and Williams, and that he saw the gun that was shown in the video. Easter testified the fourth person in the bathroom video was known as "Gunne," and Easter knew he had a "P" tattooed on his chest. Easter also knew that Thompson had a tattoo of a Playboy bunny on his arm, but these tattoos meant nothing to him. Easter testified he was present when Williams spelled out the word "Playboyz" in the bathroom video. Williams testified he did not recall Williams talking about the Bloods and the Crips during the bathroom video, and the words meant nothing to him. Easter was not present during

1          the parking lot video.

2          Easter testified he had never been charged or convicted of a crime.
           Easter admitted he vandalized a shopping cart with Tyrone
3          Williams in February 2006. He was taken to juvenile hall and
           released. He was arrested on September 10, 2008, for illegally
4          discharging a firearm, and released the same day.

5          Easter admitted he was present when a homicide occurred at a
           party in January 2009. Easter denied that he gave a gun to Maharie
6          Kidan on April 8, 2009. Easter was with Anthony Skinner during a
           traffic stop on May 28, 2009. Skinner was a close family friend,
7          but Easter did not know if he was a member of the Playboyz.

8          Easter testified he was not involved in the Franco or Gaynor
           robberies. He was not a member of any gang, and he never
9          committed any crimes for the benefit of a gang. Easter never called
           himself a member of the Playboyz, but he knew some people who
10         used that name. Easter admitted he was known by the nickname of
           "Kook."
11
           Easter testified that in the fall of 2009, he was employed by a home
12         care agency, and cared for his disabled mother under a program
           sponsored by the state. He lived with his mother, and he also
13         shared an apartment with the mother of his child.

14         Easter testified that at the time of the Franco robbery, he was
           working for the home care agency and providing services to his
15         mother. On the night of the Gaynor robbery, he was staying with
           his daughter and the child's mother, at their residence near Clinton
16         and Brawley. He cut his hair sometime after the bathroom video
           was made in September 2009, and before he was arrested on
17         November 14, 2009.

18   (Answer, Ex. 1.)

19                                         III.

20                                    DISCUSSION

21          A.      Jurisdiction

22          Relief by way of a petition for writ of habeas corpus extends to a person in custody

23   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

24   or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v.

25   Taylor, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as

26   guaranteed by the U.S. Constitution.  The challenged conviction arises out of Fresno County

27   Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28

28   U.S.C. § 2241(d).

1    On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

2    of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

3    enactment.  Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

4    Cir. 1997) (en banc).  The instant petition was filed after the enactment of the AEDPA and is

5    therefore governed by its provisions.

6           **B.     Standard of Review**

7           Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

8    barred unless a petitioner can show that the state court's adjudication of his claim:

9
10          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
11          determined by the Supreme Court of the United States; or

12          (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
13          State court proceeding.

14   28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 783-84, 178 L.Ed.2d

15   624 (2011); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 413.

16          As a threshold matter, this Court must "first decide what constitutes 'clearly established

17   Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at

18   71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law,"

19   this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions

20   as of the time of the relevant state-court decision."  Williams, 592 U.S. at 412.  "In other words,

21   'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

22   set forth by the Supreme Court at the time the state court renders its decision."  Id.  In addition,

23   the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

24   principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

25   . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

26   review under AEDPA.  Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v.

27   Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

28   Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an

1   end and the Court must defer to the state court's decision.  <u>Carey</u>, 549 U.S. 70; <u>Wright</u>, 552 U.S.

2   at 126; <u>Moses</u>, 555 F.3d at 760.

3          If the Court determines there is governing clearly established Federal law, the Court must

4   then consider whether the state court's decision was "contrary to, or involved an unreasonable

5   application of," [the] clearly established Federal law."  <u>Lockyer</u>, 538 U.S. at 72 (quoting 28

6   U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ

7   if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

8   question of law or if the state court decides a case differently than [the] Court has on a set of

9   materially indistinguishable facts."  <u>Williams</u>, 529 U.S. at 412-13; <u>see also</u> <u>Lockyer</u>, 538 U.S. at

10  72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite

11  in character or nature,' or 'mutually opposed.'"  <u>Williams</u>, 529 U.S. at 405 (quoting Webster's

12  Third New International Dictionary 495 (1976)).  "A state-court decision will certainly be

13  contrary to [Supreme Court] clearly established precedent if the state court applies a rule that

14  contradicts the governing law set forth in [Supreme Court] cases."  <u>Id</u>.  If the state court decision

15  is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed

16  under the pre-AEDPA de novo standard.  <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en

17  banc).

18         "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

19  the state court identifies the correct governing legal principle from [the] Court's decisions but

20  unreasonably applies that principle to the facts of the prisoner's case."  <u>Williams</u>, 529 U.S. at

21  413.  "[A] federal court may not issue the writ simply because the court concludes in its

22  independent judgment that the relevant state court decision applied clearly established federal

23  law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Id</u>. at 411;

24  <u>see also</u> <u>Lockyer</u>, 538 U.S. at 75-76.  The writ may issue only "where there is no possibility

25  fairminded jurists could disagree that the state court's decision conflicts with [the Supreme

26  Court's] precedents."  <u>Harrington</u>, 131 S.Ct. at 784.  In other words, so long as fairminded jurists

27  could disagree on the correctness of the state courts decision, the decision cannot be considered

28  unreasonable.   <u>Id</u>.   If   the   Court   determines   that   the   state   court   decision   is   objectively

1  unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the

2  error had a substantial and injurious effect on the verdict.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619,

3  637 (1993).

4          Petitioner has the burden of establishing that the decision of the state court is contrary to

5  or involved an unreasonable application of United States Supreme Court precedent.  <u>Baylor v.</u>

6  <u>Estelle</u>, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

7  states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

8  state court decision is objectively unreasonable.  <u>See LaJoie v. Thompson</u>, 217 F.3d 663, 669

9  (9th Cir. 2000); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th Cir. 1999).

10         The AEDPA requires considerable deference to the state courts.  "[R]eview under §

11  2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on

12  the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review."

13  <u>Cullen v. Pinholster</u>, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations

14  by state courts are presumed correct absent clear and convincing evidence to the contrary."

15  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)).  However, a

16  state court factual finding is not entitled to deference if the relevant state court record is

17  unavailable for the federal court to review.  <u>Townsend v. Sain</u>, 372 U.S. 293, 319 (1963),

18  *overruled by*, <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1 (1992).

19         **C.      Review of Claims**

20              1.    <u>Insufficient Evidence</u>

21         In his first claim for relief, Petitioner alleges that there was insufficient evidence to prove

22  that the gang's primary activity was committing robberies and that there was insufficient

23  evidence to prove the gang enhancements.  (Doc in support of Pet. at 5-9).  Petitioner contends

24  that there was insufficient evidence to support the jury's finding on the gang enhancements that

25  the crimes were committed for the benefit of, at the direction of, or in association with a street

26  gang, and there was no evidence to find he had the specific intent to promote, further or assist

27  criminal conduct by gang members.

28         This claim was presented on direct appeal to the Fifth District Court of Appeal and it was

denied in a reasoned decision.  Petitioner then presented this claim in a petition for review to the California Supreme Court.   The California Supreme Court summarily denied the petition. Federal courts review the last reasoned state court opinion.  Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991).  Therefore, the Court must review the opinion of the Fifth District Court of Appeal. In rejecting Petitioner's claim, the appellate court stated as follows:

## II. *Substantial evidence of "primary activities"*

Thompson and Williams contend there is insufficient evidence to support the "primary activities" element of count IV, the gang substantive offense (§ 186.22, subd. (a)), and the gang enhancements found true for counts I and II, the Gaynor and Franco robberies (§ 186.22, subd. (b)(1)). Defendants acknowledge that Officer Flowers testified that robberies were the primary activities of the Playboyz, but they argue Flowers's testimony was insufficient because he merely referred to police reports as the basis for his opinion, and he failed to offer specific testimony about the nature of these alleged robberies.

### A. *Substantial evidence*

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) The same substantial evidence standard applies when reviewing a jury's true finding on gang enhancements. (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 (*Albillar* ).)

### B. Primary activities

To establish that a group is a criminal street gang within the meaning of section 186.22, for purposes of both the gang substantive offense and the gang enhancement, "the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's *primary activities* is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.]" (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457, italics added; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1221–1222; § 186.22, subd. (f).)

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations," as opposed to the "occasional commission of those crimes by [one or more of] the group's members." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith.*)

"Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute," and may be accomplished through expert testimony. (*Id.* at p. 324, original italics.)

The enumerated criminal acts which consist of the "primary activities" include unlawful homicide, manslaughter, assault with a deadly weapon or by means of force likely to produce great bodily injury, burglary, robbery, narcotics offenses, shooting at an inhabited dwelling or motor vehicle, discharging a firearm from a motor vehicle, felony vandalism, and grand theft. (§ 186.22, subd. (e).)

To make the required showing of primary activities, the prosecution may rely on evidence of the presently charged crimes, past offenses, and evidence of crimes committed by other gang members. (*Sengpadychith, supra,* 26 Cal.4th at pp. 323–324; *People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley* ); *Duran, supra,* 97 Cal.App.4th at p. 1465.)

"Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities. Both past and present offenses have some tendency in reason to show the group's primary activity [citation] and therefore fall within the general rule of admissibility [citation]." (*Sengpadychith, supra,* 26 Cal.4th at p. 323.)

The primary activities element may also be established through expert testimony regarding the gang's activities. (*Sengpadychith, supra,* 26 Cal.4th at p. 324; *Gardeley, supra,* 14 Cal.4th at p. 617; *People v. Vy, supra,* 122 Cal.App.4th at p. 1226) "The testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities. [Citations.]" (*Duran, supra,* 97 Cal.App.4th at p. 1465; *People v. Killebrew* (2002) 103 Cal.App.4th 644, 657, disapproved on other grounds in *People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn. 3.)

For example, the California Supreme Court has explained that the primary activities element might be satisfied by expert testimony of the type found in *Gardeley, supra,* 14 Cal.4th 605, where a police gang expert testified that the defendant's gang "was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. [Citation.]" (*Sengpadychith, supra,* 26 Cal.4th at p. 324.)

Similarly, *Duran* held there was substantial evidence that one of the gang's primary activities was the commission of one or more of the statutorily enumerated offenses because the gang expert's "testimony supported a jury finding that members of the [gang] were engaged in more than the occasional sale of narcotics,

robbery, or assault. [The gang expert] testified that the [gang] members engaged in these activities 'often,' indeed often enough to obtain 'control' of the narcotics trade in a certain area of Los Angeles. Evidence of the [charged] robbery and [a gang member's prior] conviction [for felony possession of cocaine base for sale] further corroborated [the expert's] testimony, providing specific examples of [gang] members' commission of robbery and narcotics offenses." (*Duran, supra,* 97 Cal.App.4th at p. 1465.)

**C. *Analysis***

There is substantial evidence to support the primary activities element of the gang allegations in this case based on Officer Flowers's testimony. It is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation. (*Gardeley, supra,* 14 Cal.4th at p. 617; *People v. Valdez* (1997) 58 Cal.App.4th 494, 506.) "Expert testimony may be founded on material that is not admitted into evidence and on evidence that is ordinarily inadmissible, such as hearsay, as long as the material is reliable and of a type reasonably relied upon by experts in the particular field in forming opinions. [Citation.] Thus, a gang expert may rely upon conversations with gang members, his or her personal investigations of gang-related crimes, and information obtained from colleagues and other law enforcement agencies. [Citations.]" (*Duran, supra,* 97 Cal.App.4th at pp. 1463–1464.)

Officer Flowers testified that he was familiar with the Playboyz because he had validated the gang's existence, he had spoken to members of the gang, he was familiar with the gang's activities, and he reviewed numerous police reports about the gang's activities. Based on his extensive background and experience, he testified to his opinion that the primary activity of the Playboyz gang was robbery. Flowers's opinion was based on his review of approximately 12 police reports involving incidents where members of the Playboyz committed robberies, from 2006 to 2009. Flowers testified the gang had "the pattern, again the consistency of violating Penal Code [section] 211." Flowers testified he had also investigated homicides, shootings, and firearm cases which involved members of that gang.

Thompson and Williams argue Officer Flower's testimony was insufficient to establish the gang's primary activities, based on the holding in *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*).) In that case, the court held the gang expert's testimony lacked foundation and was insufficient to support the primary activities element. The officer testified only about general offenses committed by the gang, and about a predicate offense in which the alleged gang member was actually acquitted of the gang allegation. The officer failed to explain how he knew about the offenses. (*Id.* at pp. 611–612.) On cross-examination, the officer conceded that the vast majority of cases related to the gang involved graffiti, and he failed to specify whether the incidents involved misdemeanor or felony vandalism. (*Ibid.*) *Alexander L.* held that since "information establishing reliability was never

elicited from [the expert] at trial," it was "impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay." (*Id.* at p. 612, fn. omitted.)

As explained in *People v. Martinez* (2008) 158 Cal.App.4th 1324 (*Martinez* ), the gang expert in *Alexander L.* "never specifically testified about the primary activities of the gang. He merely stated 'he "kn[e]w" that the gang had been involved in certain crimes.... He did not directly testify that criminal activities constituted [the gang's] primary activities.' [Citation.]" (*Martinez, supra,* 158 Cal.App.4th at p. 1330.) The court in *Martinez* contrasted the gang expert's testimony in that case with the insufficient foundational testimony in *Alexander L.:* "[In *Martinez* ], on the other hand, [the gang expert] had both training and experience as a gang expert. He specifically testified as to [the gang's] primary activity. His eight years dealing with the gang, including investigations and personal conversations with members, and reviews of reports suffices to establish the foundation for his testimony. [Citation.]" (*Martinez, supra,* 158 Cal.App.4th at p. 1330; see also *People v. Margarejo* (2008) 162 Cal.App.4th 102, 107–108 [distinguishing *Alexander L.*].)

In this case, Officer Flowers's testimony provided substantial evidence about the primary activities of the Playboyz. Flowers established the foundation for his testimony, he did not equivocate about the basis for his opinions, and he did not contradict himself about his opinions on the activities of the Playboyz. In contrast, the expert in *Alexander L.* failed to establish the foundation for his testimony, failed to testify the crimes he cited constituted the gang's primary activities, equivocated on direct examination, and contradicted himself on cross-examination. Flowers's testimony did not suffer from these foundational defects. (Cf. *Alexander L., supra,* 149 Cal.App.4th at pp. 611–612.) Flowers had a sufficient foundation for his opinions based on his own interactions with members of the Playboyz, his personal investigation into the gang's activities, his conversations with other law enforcement officers, and his review of law enforcement reports about the Playboyz.

### III. *Substantial evidence to support gang enhancements*

Thompson contends there is insufficient evidence to support the gang enhancements found true as to counts I and II, whether the robberies of Gaynor and Franco were "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members ...." (§ 186.22, subd. (b)(1).) Thompson argues the Franco and Gaynor robberies were committed for his personal benefit, and there was no evidence any of the robbery suspects wore gang attire or colors, flashed gang signs, or made any remarks regarding the alleged "Playboyz" gang when the robberies were committed.

### A. *Elements of the gang enhancement*

To establish a gang enhancement, the prosecution must prove two

elements: (1) that the crime was "committed for the benefit of, at the direction of, *or* in association with any criminal street gang," and (2) that the defendant had "the specific intent to promote, further, or assist in any criminal conduct by gang members ...." (§ 186.22, subd. (b)(1), italics added.)

As to the first element, "[n]ot every crime committed by gang members is related to a gang." (*Albillar, supra,* 51 Cal.4th at p. 60.) However, the gang-related requirement for the enhancement may be shown by evidence indicating that several defendants "came together *as gang members* " to commit the offense, or that the offense could benefit the gang by elevating the gang's or gang members' status or advancing the gang's activities. (*Albillar, supra,* 51 Cal.4th at pp. 62–63, original italics; see *Gardeley, supra,* 14 Cal.4th at p. 619.) If the evidence is sufficient to establish the crime was committed "in association" with a gang, the prosecution need not prove that it was committed for the benefit of or at the direction of a gang. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 (*Morales* ).)

As for the second element of specific intent, it does not require "that the defendant act with the specific intent to promote, further, or assist a *gang; the statute requires only the specific intent to promote, further, or assist criminal conduct by gang members.*" (*Albillar, supra,* 51 Cal.4th at p. 67, original italics.) "[S]pecific intent to *benefit* the gang is not required." (*Morales, supra,* 112 Cal.App.4th at p. 1198, original italics.) The specific intent element "applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*Albillar, supra,* 51 Cal.4th at p. 66, original italics.) The scienter requirement is "the specific intent to promote, further, or assist in *any* criminal conduct by gang members—including the current offenses—and not merely *other* criminal conduct by gang members." (*Albillar, supra,* 51 Cal.4th at p. 65, original italics.)

"[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar, supra,* 51 Cal.4th at p. 68.) "Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime. [Citation.]" (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.)

The prosecution's gang expert may testify about whether the defendant acted for the benefit of, at the direction of, or in association with a gang, even though it is an ultimate factual issue for the jury to decide, because these are matters far beyond the common experience of the jury. (*People v. Valdez, supra,* 58 Cal.App.4th at pp 508–509.)

"A gang expert['s] testimony alone is insufficient to find an offense

24

gang related. [Citation.] '[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of, at the direction of, or in association with a criminal street gang.' [Citation.]" (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657.)

**B.   Commission of crimes "in association with" a criminal street gang**

Thompson argues there is no evidence he committed the robberies to "benefit" the Playboyz. However, several cases have found substantial evidence to support gang enhancements where gang members commit offenses "in association" with fellow gang members within the meaning of section 186.22, subdivision (b)(1). For example, in *Morales, supra,* 112 Cal.App.4th 1176, the defendant and two fellow gang members committed a robbery and other offenses, and the jury found the gang allegations true. The prosecution's gang expert testified that, based on a hypothetical, the crimes were committed in association with a criminal street gang because "they involved three gang members acting in association with each other. The gang provided 'a ready-made manpower pool....' That is, one gang member would choose to commit a crime in association with other gang members because he could count on their loyalty. They would 'watch his back....' In addition, the very presence of multiple gang members would be intimidating. The crime would benefit the individual gang members with notoriety among the gang, and the gang with notoriety among rival gang members and the general public." (*Id.* at p. 1197.)

*Morales* rejected the defendant's argument that there was insufficient evidence that he committed the offenses to *benefit* his gang, and instead noted the gang expert's focus was on "a crime committed, not just by a gang member, but by several gang members, acting in association with each other. Also, [the expert] did not testify that such a crime necessarily would benefit the gang, merely that it would be committed *either* for the benefit of, *or* at the direction of, *or* in association with the gang." (*Morales, supra,* 112 Cal.App.4th at p. 1197, original italics.)

"Defendant argues that reliance on evidence that one gang member committed a crime in association with other gang members is 'circular....' Not so. Arguably, such evidence alone would be insufficient, even when supported by expert opinion, to show that a crime was committed for the *benefit* of a gang. The crucial element, however, requires that the crime be committed (1) for the benefit of, (2) at the direction of, *or* (3) in *association* with a gang. Thus, the typical close case is one in which one gang member, acting alone, commits a crime. Admittedly, it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang. Here, however, there was no evidence of this. Thus, the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members.

"If defendant is arguing that there was insufficient evidence of the specific intent element (as opposed to the benefit/direction/association element), we disagree. Again, specific intent to *benefit* the gang is not required. What is required is the 'specific intent to promote, further, or assist in any criminal conduct by gang members....' Here, there was evidence that defendant intended to commit robberies, that he intended to commit them in association with [his fellow gang members], and that he knew that [they] were members of his gang. Moreover, ... there was sufficient evidence that defendant intended to aid and abet the robberies [his fellow gang members] actually committed. It was fairly inferable that he intended to assist criminal conduct by his fellow gang members." (*Morales, supra,* 112 Cal.App.4th at p. 1198, original italics.)

In *People v. Romero* (2006) 140 Cal.App.4th 15, the defendant drove fellow gang members to the site of a drive-by shooting, and the court found the gang enhancements were supported by substantial evidence because the defendant committed the offenses in association with fellow gang members. "There was ample evidence that [defendant] intended to commit a crime, that he intended to help [his accomplice] commit a crime, and that he knew [his accomplice] was a member of his gang. This evidence creates a reasonable inference that [defendant] possessed the specific intent to further [his accomplice's] criminal conduct." (*Id.* at p. 20.)

A similar result was reached in *People v. Martinez, supra,* 158 Cal.App.4th 1324, where the defendant admitted membership in a criminal street gang, and he committed robberies with another admitted member of that gang. The defendant argued there was insufficient evidence to support the gang enhancement because his accomplice was also his brother-in-law, and they committed the offenses for their own personal benefit. (*Id.* at pp. 1332–1333.) *Martinez* rejected the argument and noted the gang expert testified "this evidence showed defendant committed the robbery *in association* with the gang. The elements of the gang enhancement may be proven by expert testimony. [Citation.] Nor does it matter that defendant did not commit the crime on or live in gang turf or that [the gang expert] had never heard of defendant or [his accomplice]. Defendant did not even need to be an ' "active" ' or ' "current, active" ' gang member. [Citation.]" (*Id.* at p. 1332, italics added.) "Here defendant, an admitted gang member sporting gang tattoos, actually committed the robbery with a gang confederate. That he was not in his gang's territory, by itself, does not necessarily overcome the other supporting evidence." (*Id.* at p. 1333.)

In *People v. Leon* (2008) 161 Cal.App.4th 149 (*Leon* ), the defendant and an accomplice were members of the same gang, and they stole a car and threatened an eyewitness. The defendant argued there was insufficient evidence that he committed the offenses for the benefit of his gang. *Leon* relied on *Morales* and *Romero,* and rejected this argument because "a 'specific intent to *benefit* the gang is not required.' [Citation.]" (*Leon, supra,* at p.

163.) *Leon* held there was substantial evidence that the defendant committed the offenses in association with a fellow gang member. There was also evidence of the defendant's specific intent because he intended to commit the offenses, he intended to do so in association with his accomplice, and he knew his accomplice was a member of his gang. (*Ibid.*)

## C. *Analysis*

Thompson argues there is insufficient evidence the Gaynor and Franco robberies were gang related, based on several cases which affirmed gang enhancements in situations where gang members committed particular offenses for the benefit of their particular criminal street gangs because they were claiming gang turf, selling drugs on that turf, shouting gang names, and/or seeking to instill fear in the area. (See, e.g., *Albarran, supra,* 149 Cal.App.4th at pp. 220–221; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1197–1199; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 928; *People v. Ochoa, supra,* 179 Cal.App.4th 650, 661–664.)

Thompson's reliance on these cases is misplaced. In this case, as in *Morales, Martinez,* and *Leon,* there is substantial evidence to support the gang enhancements because each defendant, an active member of the Playboyz criminal street gang, committed the Franco and Gaynor robberies "in association with" two other active members of the Playboyz. The defendants acted in concert with each other. Williams placed the telephone call, pretending to be interested in the sales item, and lured the victims to secluded or dark areas to conduct the transaction. Williams approached the victim at the designated location, and again stated his intent to look at the item. Thompson and Easter arrived, and took turns as the gunman. The three defendants arrived and fled together, taking the victims' property. The videos on Williams's cell phone demonstrated that each defendant knew that the other defendants claimed membership in the Playboyz. There was thus overwhelming evidence that defendants knew their associates were gang members, they each intended to commit the robberies in association with the others, and the stolen property from all the robberies were found in the apartment of Thompson's grandmother, where Thompson and Williams were arrested shortly after the Gaynor robbery. We conclude that the jury's true findings on the gang enhancements in this case are supported by substantial evidence.

## D. *Albillar*

Defendant Thompson further argues that gang connection in this case was "incidental" to the Gaynor and Franco robberies because he committed the crimes for personal reasons, and he "sought back up from family" who happened to be members of the Playboyz. Defendant Thompson asserts his "position is somewhat borne out" by *Albillar, supra,* 51 Cal.4th 47, where the California Supreme Court addressed a substantial evidence challenge to the gang enhancements found true as to defendants' sexual assault convictions in that case. The defendants in *Albillar* argued the sexual assaults were not "gang-related" because the defendants were related to each other, they lived together, and it was

27

conceivable that " 'several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang.' [Citation.]" (*Id.* at pp. 59–60, 62.)

*Albillar* rejected defendants' arguments and found there was substantial evidence to support the gang enhancements for two reasons: the offenses were committed in association with gang members, and the offenses were committed for the benefit of the gang. (*Albillar, supra,* 51 Cal.4th at p. 60.) "The record supported a finding that [the] defendants relied on their common gang membership and the apparatus of the gang in committing the sex offenses against [the victim]." (*Ibid.*) In particular, the court cited expert testimony about how gang members earn respect and status by committing crimes with other members, and that gang members choose to commit crimes together in order to increase their chances of success and to provide training for younger members. (*Id.* at pp. 60–61.)

*Albillar* concluded that defendants' conduct, where each participant assisted the others without a word being spoken, and each could rely on the silence of the others and group intimidation of the victim, "exceeded that which was necessary to establish that the offenses were committed in concert." (*Albillar, supra,* 51 Cal.4th at p. 61.)

"Defendants not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police and on the gang's reputation to ensure that the victim did not contact the police." (*Id.* at pp. 61–62.)

*Albillar* also found substantial evidence the crimes were committed to benefit the gang. (*Albillar, supra,* 51 Cal.4th at p. 63.) The court cited the gang expert's testimony, that " '[w]hen three gang members go out and commit a violent brutal attack on a victim, that's elevating their individual status, and they're receiving a benefit. They're putting notches in their reputation. When these members are doing that, the overall entity benefits and strengthens as a result of it.' Reports of such conduct 'rais[e] the[ ] level of fear and intimidation in the community.' " (*Ibid.*) *Albillar* explained:

"Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of ... a[ ] criminal street gang' within the meaning of section 186.22[, subd.] (b)(1)." (*Ibid.*)

Thompson asserts *Albillar* supports his evidentiary challenge to the gang enhancements in this case based on several factors: there were strong family ties between Williams, Easter, and Thompson, these ties prompted the family to "work together," the robberies

were committed solely for Thompson's personal benefit to pay his rent and not for any gang, and Officer Flowers did not offer expert testimony similar to the expert who testified in *Albillar,* that defendants committed the robberies to intimidate others, and enhance their reputation and status in the gang.

Thompson presented similar arguments to the jury, when he testified that he committed the robberies because he needed the money to pay his rent, and he did not intend to benefit any gang. These arguments were completely dependent on the jury's determination of Thompson's credibility, and the verdicts and findings in this case infer the jury rejected Thompson's veracity.

As acknowledged by *Albillar,* not every crime committed by gang members is gang-related for purposes of the enhancement, and the mere fact that gang members commit a crime together does not mean the crime is gang-related for purposes of section 186.22, subdivision (b). (*Albillar, supra,* 51 Cal.4th at pp. 60, 62.) As in *Albillar,* however, there was substantial evidence to support the gang enhancements in this case because the three defendants "came together *as gang members* to [rob the victims] and, thus ... they committed [the substantive offenses] in association with the gang." (*Id.* at p. 62, original italics.)

Thus, as to the first element of the enhancement, defendants Williams, Thompson and Easter came together to commit a series of robberies in association with each other, the "bathroom" video demonstrated their knowledge of each other's affiliation, and they committed offenses which Officer Flowers identified as the primary activity of the Playboyz. As to the second element of the enhancement, there was evidence the defendants intended to, and did commit, the robberies with known members of a gang, and the jury could have fairly inferred that defendants had "the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar, supra,* 51 Cal.4th at p. 68.)

(ECF No 11, Exhibit 1.)

The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Sufficiency claims are judged by the elements defined by state law.  Id. at 324 n.16.  On federal habeas review, AEDPA requires an additional layer of deference to the state decision.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  This Court must determine whether the state decision was an unreasonable application of the Jackson standard.

///

### a.  Primary Activities of Criminal Street Gang

To establish that a group is a criminal street gang within the meaning of section 186.22, for purposes of both the gang substantive offense and the gang enhancement, "the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's *primary activities* is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.]" (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457, italics added; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1221–1222; § 186.22, subd. (f).)  Under California law, "[s]ufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute."  People v. Sengpadychith, 26 Cal.4th 316, 324 (2001).  A gang's primary activity can be established through expert testimony.  Id.; see also CALJIC No. 17.24.2.

Petitioner argues that there was insufficient evidence to find that the Playboyz are a criminal street gang within the definition of section 186.22, because there was insufficient proof that robbery is a primary activity of the group.  Respondent argues that Officer Flowers's expert testimony constituted substantial evidence that the primary activity of the Playboyz gang was committing robberies.

In this case, the appellate court applied the correct standard in reviewing the claim by viewing the evidence in the light most favorable to the judgment to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  Moreover, it cannot be said that no fairminded jurist would agree with the state court's decision.  There was ample evidence that committing robberies was the primary activity of the Playboyz gang.  "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations," as opposed to the "occasional commission of those crimes by [one or more of] the group's members."  Sengpadychith, 26 Cal. 4th at 324.

Officer Flowers testified that in his opinion the primary activity of the Playboyz gang was

robbery.   Officer Flowers had extensive knowledge of the Playboyz gang because he had validated the gang's existence, spoken to members of the gang, was familiar with the gang's activities, and had reviewed approximately 12 police reports from 2006 through 2009 about the gang's activities involving incidents where members of the Playboyz committed robberies. Officer Flowers's established the foundation for his testimony and he didn't contradict himself about the activities of the Playboyz gang.   Therefore, Officer Flowers's expert testimony provided sufficient evidence that robbery was a primary activity of the Playboyz, and this claim must be denied.

### b.  Gang enhancement

Cal. Penal Code § 186.22(b)(1)'s gang enhancement may only be applied if the prosecution proves the following two elements beyond a reasonable doubt: (1) that Petitioner committed a felony "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) that he did so "with the specific intent to promote, further, or assist in any criminal conduct by gang members."   To sustain the imposition of a gang enhancement pursuant to Cal. Penal Code § 186.22(b)(1), "there must have been evidence upon which a rational trier of fact could find that [a defendant] acted with the 'specific intent to promote, further, or assist in' some type of 'criminal conduct by gang members,' which may include the crimes of conviction." Emery v. Clark, 643 F.3d 1210, 1216 (9th Cir.2011) (quoting Cal. Penal Code § 186.22(b)(1).)

The mental element of the gang enhancement requires substantial evidence from which the jury can infer that in committing the gang-related criminal act, defendant specifically intended to engage in or promote criminal gang conduct.  (People v. Albillar, supra, 51 Cal.4th at p. 68.)  A finding of specific intent requires a subjective desire.  (See 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 5, p. 204.)  However, "[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense."  (People v. Pre (2004) 117 Cal.App.4th 413, 420.)

The second requirement "is not satisfied by evidence of mere membership in a criminal street gang alone." Briceno v. Scribner, 555 F.3d 1069, 1078 (9th Cir. 2009) (citing Garcia v. Carey, 395 F.3d 1099, 1102-1103 & n.9 (9th Cir. 2005).  In Briceno, the gang expert testified in

terms of "generalities" that the crimes could glorify the gang, but did not provide direct or circumstantial evidence regarding the defendant's specific intent. Briceno, 555 F.3d at 1078. In such circumstances, the Ninth Circuit held the expert testimony did not establish the petitioner's specific intent in committing the crimes. Id. at 1078-1079. This was particularly so in Briceno because the defendant submitted proof of a different motivation, i.e. personal gain.

Subsequent to Garcia v. Carey, the California courts have held that section 186.22's specific intent element does not require the intent to enable or assist criminal activities by gang members aside from the offense charged. The intent to commit the gang related offense suffices. See e.g., People v. Hill, 142 Cal.App.4th 770, 774 (2006); People v. Romero, 140 Cal.App.4th 15, 19-20 (2006); People v. Vasquez, 178 Cal.App.4th 347, 353-354 (2009). Because of the conflict, the Ninth Circuit recently asked the California Supreme Court to decide the question of state law. Emery v. Clark, 604 F.3d 1102 (9th Cir. 2010). On June 23, 2010, the California Supreme Court granted the request for certification and deferred further action pending consideration of a related issue in People v. Albillar, 162 Cal.App.4th 935 (2008). On December 20, 2010, the California Supreme Court issued its decision in Albillar and rejected the Ninth Circuit's reasoning in Garcia and Briceno finding "[t]here is no statutory requirement that this 'criminal conduct by gang members' be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing." (Citations omitted). People v. Albillar, __ Cal.Rptr.3d __, 51 Cal.4th 47, 2010 WL 5140768 *13 (Cal. 2010). Therefore, the California Supreme Court has specifically interpreted its law to the contrary of the interpretation in Briceno and Garcia, and such rulings are inoperative.

In this case, the appellate court applied the correct standard in reviewing the claim by viewing the evidence in the light most favorable to the judgment to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Moreover, it cannot be said that no fairminded jurist would agree with the state court's decision. There was ample evidence from which to conclude that Petitioner committed the robberies in association with a criminal street gang, and with the specific intent to promote, further, or assist criminal

conduct by gang members.  The appellate court found that there was sufficient evidence to support that Petitioner committed the robberies for the benefit of, at the direction of, or in association with the Playboyz gang, because the defendants came together to commit a series of robberies in association with each other, the "bathroom" video demonstrated their knowledge of each other's gang affiliation, and Officer Flowers's testimony provided sufficient proof that the robberies constituted a primary activity of the gang.

In these circumstances, it would not be unreasonable to conclude that a rational trier of fact could have found that when Petitioner, Williams, and Easter acted together to commit the robberies, Petitioner specifically intended to "assist in" criminal conduct (robbery) by known gang members (himself, Williams, and Easter) within the meaning of section 186.22(b)(1). Accordingly, the state court rejection of Petitioner's claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).  This claim must be denied.

### 2. Bifurcation of the gang evidence

Petitioner next argues that the trial court abused its discretion when it denied Petitioner's pretrial motion to sever the substantive gang offense in count IV (Cal. Penal Code § 186.22(a)), and bifurcate the gang enhancements (Cal. Penal Code § 186.22(b)(1)) from the three robbery charges.  The California Court of Appeal rejected this argument:

**I. *Denial of severance/bifurcation motions on gang allegations and evidence***
Thompson and Easter contend the court abused its discretion when it denied their pretrial motion to sever count IV, the substantive gang offense (§ 186.22, subd. (a)), and bifurcate the gang enhancements (§ 186.22, subd. (b)(1)), from the three robbery charges. Defendants argue the gang evidence was irrelevant and prejudicial to the robbery charges because there was no evidence the suspects committed the robberies to benefit any gang.

**A. *Background***
Prior to trial, Easter moved to bifurcate the robbery charges from count IV, the gang substantive offense, and the gang enhancements; Thompson and Williams joined the motion. They argued the gang evidence was irrelevant and prejudicial to the robbery charges. The prosecutor replied the gang evidence was relevant to prove that defendants intended to aid and abet each other in the commission of the robberies, particularly during the Gaynor robbery. The prosecutor also cited to the "bathroom" video

which showed all three defendants talking about the Playboyz gang, and throwing gang signs, while Thompson held the gun which appeared to have been used in the robberies.

The trial court denied defendants' bifurcation motion:

"[T]he court does not find the inclusion of the gang enhancement or the gang charge is such that it will unduly prejudice the defendants in their ability to receive a fair trial. It does not show any extraordinary prejudice in this Court's mind. So the motion to bifurcate is denied. Because in essence what counsel is asking is not just for a bifurcation of the enhancements but for a severance of [count IV]. Because in essence it would be virtually impossible for counsel or for the Court to adequately explore the minds of potential jurors in this case concerning gangs during voir dire if the same jury was going to ultimately hear evidence on an enhancement and the gang count separate from the underlying charges. We couldn't do that. We would have to have basically a new jury which would allow counsel and the Court to explore those attitudes.

"Because by simply taking what [Williams's attorney] said, by simply mentioning gangs in the context of a jury trial, that doesn't have any information concerning gangs, at least so far as the jury is concerned. They wouldn't know what is going on in this case. They would suspect but they would not know. It will cause them to speculate, in other words, if we were to start asking them questions about an enhancement, or charges or associations without there being any charges or enhancements in the case to begin with.

"The Court is satisfied that the jurors—and the law recognizes that the jurors will do their responsibility and will follow the law. They will be informed as to any evidence concerning gang affiliation or gang conduct would be admitted for the sole purpose of determining whether the allegations are true concerning the enhancement and the charge, but they are not to consider that concerning the underlying robbery charges, only the gang charges. So the request to bifurcate is denied."

**B. *Bifurcation***

A trial court has broad discretion to control the conduct of a criminal trial, including the power to bifurcate a gang enhancement from trial on the substantive charges. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).) However, the need to bifurcate gang allegations is often not as compelling as for the bifurcation of prior conviction evidence. (*Id.* at pp. 1048–1049.) "A prior conviction allegation relates to the defendant's *status* and may have no connection to the charged offense; by contrast, the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense. So less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation. [Citation.]" (*Id.* at p. 1048, original italics.)

In moving for bifurcation, the defense must " 'clearly establish that

there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.]" (*Hernandez, supra,* 33 Cal.4th at p. 1051.) Bifurcation may be necessary where the predicate offenses offered to establish the pattern of criminal activity are "unduly prejudicial," or where some of the other gang evidence may be "so extraordinarily prejudicial, and of so little relevance to guilt," that it may influence the jury to convict regardless of the defendant's guilt. (*Id.* at p. 1049.) We review the trial court's denial of a motion to bifurcate for abuse of discretion. (*Id.* at p. 1048.)

**C. *Severance***

Joint trials of offenses which occur together are legislatively preferred over separate trials, and the party requesting severance of properly joined offenses has the burden to "clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. [Citations.]" (*People v. Bean* (1988) 46 Cal.3d 919, 938–939; *Burnell, supra,* 132 Cal.App.4th at p. 946; see § 954.)

"In the context of severing charged offenses, we have explained that 'additional factors favor joinder. Trial of the counts together ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' [Citation.] Accordingly, when the evidence sought to be severed relates to a charged offense, the 'burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. [Citations.]" (*Hernandez, supra,* 33 Cal.4th at p. 1050.)

As with bifurcation, the court's ruling on a severance motion is reviewed for abuse of discretion. (*People v. Marshall* (1997) 15 Cal.4th 1, 27–28.) "Whether a trial court abused its discretion in denying a motion to sever necessarily depends upon the particular circumstances of each case. [Citations.] The pertinent factors are these: (1) would the evidence of the crimes be cross-admissible in separate trials; (2) are some of the charges unusually likely to inflame the jury against the defendant; (3) has a weak case been joined with a strong case or another weak case so that the total evidence on the joined charges may alter the outcome of some or all of the charged offenses; and (4) is any one of the charges a death penalty offense, or does joinder of the charges convert the matter into a capital case. [Citation.] A determination that the evidence was cross-admissible ordinarily dispels any inference of prejudice. [Citations.]" (*Ibid.*)

**D. *The court did not abuse its discretion***

The trial court did not abuse its discretion when it denied defendants' motions for severance and bifurcation of the gang allegations and evidence in this case. The gang evidence was necessarily intertwined with the charged offenses as to several relevant issues, particularly aiding and abetting, identity, and bias. As we will discuss in issue IV, *post,* one of the key issues in the Gaynor robbery was the culpability of Williams and Easter, who stood by while Thompson pulled the gun and went through

Gaynor's pockets. Their joint gang status was clearly relevant as circumstantial evidence of their intent and knowledge to prove aiding and abetting to commit robbery. (See, e.g., *Burnell, supra,* 132 Cal.App.4th 938, 947; *People v. Salgado* (2001) 88 Cal.App.4th 5, 15–16; *In re Jose T.* (1991) 230 Cal.App.3d 1455, 1460–1461.)

In addition, the defendants' common gang membership was relevant and admissible as to identity, bias, and impeachment. In his postarrest statement, Williams said that "Alex" and not Easter was the gunman for the Franco robbery. At trial, Thompson refused to identify the third suspect in the Franco and Gaynor robberies, and gave equivocal testimony about whether Easter was that man. For example, in *People v. Ruiz* (1998) 62 Cal.App.4th 234, the defendant was charged with selling drugs to an undercover officer. The defendant argued that a third party was guilty of the offense, based on that person's alleged confession to a defense investigator. *Ruiz* held the trial court properly permitted the prosecution to introduce evidence that the defendant and the third party were members of the same gang and likely knew each other, because the evidence was relevant for impeachment and bias. (*Id.* at pp. 240–243.)

As relevant to the charges in this case, "to entirely eliminate the gang evidence would have required a severance ... of the street terrorism count and the bifurcation of the gang enhancements." (*Burnell, supra,* 132 Cal.App.4th at p 947.) Defendants failed to carry their burden to clearly establish that there was a substantial danger of prejudice requiring that the charges be separately tried for severance. The gang evidence was cross-admissible as to aiding and abetting, identity, and bias of the witnesses. The substantive gang charge required much the same evidence to prove, and was no more potentially inflammatory than the other charges, such that severance would not have been appropriate. (See, e.g., *Hernandez, supra,* 33 Cal.4th at p. 1051.) In addition, the jury was correctly instructed on the limited purpose of gang evidence, including the limited admissibility of the two videos. (CALCRIM NO. 1403.) We presume the jury followed the instructions. (Cf. *Hernandez, supra,* 33 Cal.4th at pp. 1052–1053.)

**E.** *Due process*

Finally, Thompson argues the denial of his motions for bifurcation and/or severance violated his due process right to a fair trial on the robbery charges, because of the alleged "gross unfairness" that resulted from the introduction of the gang evidence in this case. Thompson's argument is based on *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran* ), which held:

"To prove a deprivation of federal due process rights, [the defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citation.] Only under such circumstances can it be

inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is ... whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citations.]' [Citation.]" (*Id.* at pp. 229–230, fn. omitted.)

However, *Albarran* dealt with a factual scenario that was different from this case. In *Albarran,* the defendant was charged with multiple offenses based on his participation in a shooting at the victim's home. He was not charged with the gang substantive offense, but gang enhancements were alleged. The trial court permitted the prosecution to introduce gang evidence to prove the defendant's motive and intent. The jury convicted the defendant of the substantive offenses and found the gang enhancements were true. Thereafter, the trial court granted defendant's posttrial motion and dismissed the gang allegations for insufficient evidence. (*Albarran, supra,* 149 Cal.App.4th at pp. 217–222.)

*Albarran* held that while the trial court may have initially found that the defendant's gang activities were relevant and probative to his motive and intent, the court abused its discretion when it permitted the prosecution to introduce additional gang evidence that was irrelevant to the defendant's motive or the substantive criminal charges. (*Albarran, supra,* 149 Cal.App.4th at p. 217.) The irrelevant evidence included other gang members' threats to kill police officers, and references to the Mexican Mafia prison gang. *Albarran* characterized the irrelevant gang evidence as "overkill," (*id.* at p 228, fn. omitted) and "extremely and uniquely inflammatory, such that the prejudice arising from the jury's exposure to it could only have served to cloud their resolution of the issues." (*Id.* at p. 230, fn. omitted.) *Albarran* found the gang evidence was so inflammatory that it "had no legitimate purpose in this trial," and held admission of that evidence violated defendant's due process rights. (*Id.* at pp. 230–231.)

In contrast to *Albarran,* the instant case is not "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*Albarran, supra,* 149 Cal.App.4th at p. 232.) The defendants in this case were charged with both the gang substantive offense and enhancements. The trial court did not grant a posttrial motion to dismiss either count IV or the enhancements. As we have explained, the jury was properly instructed on the limited admissibility of the gang evidence. As we will also explain in issues II and III, *post,* the jury's findings on the gang substantive offense and enhancements are supported by substantial evidence.

More importantly, Officer Flowers's expert testimony regarding the criminal activities of the Playboyz was not similar to the sensational and prejudicial testimony admitted in *Albarran.* While Flowers addressed predicate offenses committed by other members of the Playboyz, his testimony was limited to the essential facts which the prosecution was required to prove for the elements of both the gang substantive offense and the enhancements. The gang evidence in this case was no more sensational than the evidence as

to the three Craigslist armed robberies committed against the victims in this case. The court did not abuse its discretion when it denied bifurcation and severance of the gang allegations, and the admission of the gang evidence did not violate defendant's due process rights.

(Answer, Exhibit 1.)

The United States Supreme Court has never issued a ruling on the issue that Petitioner raises in this claim, although it has expressly declined to require bifurcation in a criminal jury trial when the prosecutor seeks to admit evidence of defendant's prior convictions during the trial to prove a sentence enhancement charge under a recidivist statute. See Spencer v. Texas, 385 U.S. 554, 565-66 (1967). Therefore, there is no clearly established Supreme Court precedent, and Petitioner cannot argue that the state court acted contrary to clearly established Supreme Court precedent. Moreover, federal courts cannot conduct a "finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983).

Nevertheless, Respondent argues that the trial court's decision not to sever the substantive gang offense and bifurcate the gang enhancement allegations did not render Petitioner's trial fundamentally unfair. (Answer at 40). Petitioner must demonstrate that the trial court's decision not to sever and bifurcate rendered the state trial fundamentally unfair in order to establish a constitutional violation warranting habeas relief. See Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991).

Respondent argues that the gang evidence was "intertwined with the charged offenses as to several relevant issues, particularly aiding and abetting, identity, and bias," so that severance and bifurcation were not necessary. (Answer at 41, Exhibit A at 16). It was reasonable for the state court to find that one of the key issues in the Gaynor robbery was the culpability of Williams and Easter, and therefore, the joint gang status was clearly relevant to prove that they had aided and abetted the robbery. It was also reasonable for the state court to find that the defendants' common gang membership in the Playboyz was relevant and admissible to impeach Williams's post arrest statement in which he claimed a third party was the gunman in the Franco robbery. Therefore, the gang evidence was cross admissible, and Petitioner has not established that the trial court's decision to not sever the substantive gang offense and bifurcate the gang

1  enhancements rendered his trial fundamentally unfair in violation of his due process rights.  In

2  addition, Petitioner has not established prejudice, as the evidence of membership in the Playboyz

3  was not highly prejudicial or inflammatory in light of the nature of the charges.  This claim must

4  be denied.

5

6                                                **IV.**

7                              **CERTIFICATE OF APPEALABILITY**

8

9          A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

10  district court's denial of his petition, and an appeal is only allowed in certain circumstances.

11  Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).   The controlling statute in determining

12  whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

13                    (a) In a habeas corpus proceeding or a proceeding under section
                      2255 before a district judge, the final order shall be subject to
14                    review, on appeal, by the court of appeals for the circuit in which
                      the proceeding is held.
15
                      (b) There shall be no right of appeal from a final order in a
16                    proceeding to test the validity of a warrant to remove to another
                      district or place for commitment or trial a person charged with a
17                    criminal offense against the United States, or to test the validity of
                      such person's detention pending removal proceedings.
18
                      (c) (1) Unless a circuit justice or judge issues a certificate of
19                    appealability, an appeal may not be taken to the court of
                      appeals from–
20
                              (A) the final order in a habeas corpus proceeding in which
21                            the detention complained of arises out of process issued by
                              a State court; or
22
                              (B) the final order in a proceeding under section 2255.
23
                      (2) A certificate of appealability may issue under paragraph (1)
24                    only if the applicant has made a substantial showing of the
                      denial of a constitutional right.
25
                      (3) The certificate of appealability under paragraph (1) shall
26                    indicate which specific issue or issues satisfy the showing
                      required by paragraph (2).
27

28          If a court denies a petitioner's petition, the court may only issue a certificate of

appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

## V.

## ORDER

Accordingly, this Court hereby ORDERS that:

1) The Petition for Writ of Habeas Corpus is DENIED with prejudice;

2) The Clerk of Court is DIRECTED to enter judgment for Respondent and close the case; and

3) The Court declines to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **November 10, 2014**

UNITED STATES MAGISTRATE JUDGE